WILLIAM V. DABOLL AND GEORGE A. JOHNSON, Administrators, v. ARTHUR F. FIELD and others.

Where an equity cause is heard and decided by a single judge, under the provisions of chapter 692 of the Statutes, it is no prejudice to the rights of the parties to enter decrees of dates after the time when the decision was rendered, inasmuch as the right of appeal to the full court runs from the date when the decree is actually entered.

Administrators represent their intestate's estate so far as regards the allowance of any accounts or claims against it, and are proper parties to appeal from a decree allowing any such claims.

An appeal properly taken from a decree made by a single judge, directing the distribution by administrators of their intestate's estate, draws after it necessarily the reconsideration of so much of another decree made by him in the same cause as also directs a distribution.

The Supreme Court has the power to proceed to the final settlement and distribution of estates of deceased persons when the fund and the parties are before it—its decrees will bind all parties who have been properly notified, either by personal or substituted service—and the court will exonerate executors and administrators for payments made according to its decree. *Semble*, that parties who have not had actual notice of a distribution may (using due diligence), by filing a bill for relief, obtain a decree directing the parties who have received an undue share thereof, to refund them their proper proportions.

E. F., by her last will and testament, directed her executors to sell at public auction and convert into cash, all the real estate of which she should die seized and possessed, and bequeathed the residue of her estate to five nephews and nieces, R., A., M., W. and N., "equally between them, share and share alike, and to their respective heirs, executors, administrators and assigns, provided they all survive me; if not, to such of them, the said R., A., M., W. and N., as shall survive me, equally between them share and share alike, and to their respective heirs, executors, administrators and assigns." None of these nephews and nieces survived her, but all of them except one left lineal descendants. *Held*, that the said E. F. must be deemed to have died intestate as to the said residue of her estate, the general rule that lineal descendants of devisees who die before their testators shall inherit their devises, as established by chapter 155, section 12, of the Revised Statutes, being governed by her manifest intention that only such of her nephews and nieces as survived her should take any share in it, and that in the above recited clause the words "heirs, executors, administrators and assigns," are used merely as words of limitation, and not to denote substituted devisees or legatees.

*Held* further, reaffirming *Smith* v. *Smith*, 4 R. I. 1, that one S. F., the only child of a brother or sister of said E. F. living at her decease, being thereby her nearest of kin, did not thereby take the residuary estate to the exclusion of the descendants of the other brothers and sisters, but that, under the statute of descents in Rhode Island (Rev. Stat. chap. 159), one-fourth part of all said residuary estate must be divided, *per stirpes*, among the descendants of each of her four brothers and sisters to the remotest degree, and the issue of any

descendants of said brothers and sisters who died in the lifetime of the said E. F., the issue of any deceased descendant in every degree taking collectively the share of the parent.

Section 3 of chapter 159 of the Revised Statutes commented on and construed.

BILL in equity, filed by the complainants, the administrators, with the will annexed, of the estate of Eleanor Field, late of Cranston, deceased, to obtain the advice of the court in relation to the construction of the will and the operation and effect of the Rhode Island statute of wills and canons of descent, under the circumstances stated in the bill, for the purpose of aiding the court of probate to a correct decree of distribution.

The testatrix by her will, dated May 3d, 1855, after making some small bequests, directed her executor, as soon as conveniently might be after her decease, to sell at public auction, and convert to cash, all the real estate of which she might die, seized and possessed, and to make the necessary conveyances to purchasers. Then follows this provision: "Sixthly. I hereby direct that all my just debts, funeral charges, and the expense of settling my estate, including the sum of one thousand dollars as a compensation to my executor hereinafter named for his services as executor, be paid out of my estate; and the residue thereof, not herein particularly given away, I give, devise and bequeath as follows, viz: To my nephew, Robert Field, son of my brother, Abner Field, deceased; my nephew, Aaron Field, son of my brother, Nehemiah Field, deceased; my niece, Mary Field, daughter of my brother, David Field, deceased; my nephew, William F. Waterman, son of my sister, Esther Waterman, deceased; and my nephew, Nathan Waterman, son of my said sister, Esther Waterman, deceased, equally between them, share and share alike, and to their respective heirs, executors, administrators, and assigns, provided they all survive me; if not, to such of them, the said Robert, Aaron, Mary, William F., and Nathan, as shall survive me, equally between them, share and share alike, and to their respective heirs, executors, administrators, and assigns." The testatrix died March 6th, 1864, without issue and without leaving any father, mother, brother, or sister her surviving; and the five residuary legatees,

named in the sixth clause of the will, already referred to, all died in the lifetime of the testatrix. Each of the residuary legatees, except Nathan Waterman, died leaving lineal descendants. Said Nathan Waterman died intestate, but it was not known whether the other four residuary devisees did or did not die intestate. Nor was it known, except in one or two cases, whether the descendants of the testatrix's brothers and sisters, who had died since her decease, had or had not devised or made any other disposition of the interest (if any) which they acquired as heirs at law of the testatrix. Some of the defendants were the descendants of descendants who were not in being at the time of the testatrix's death. All the nephews and nieces of the testatrix, except Stephen Field, son of her brother, Abner Field, died in her lifetime.

At the time of filing the bill, the complainants had fully settled the estate, with the exception that the sum of $29,664.03 remained in their hands for distribution, being the balance of personal estate and proceeds of the real estate converted under the directions contained in the will, with considerable interest and rents received by the administrators from investments made by them and the leasing of the real estate, after deduction of the debts, funeral charges, and the expenses of settling the estate, up to the time of the commencement of this suit. A portion of the real estate came to the testatrix by descent and devise from her father and sisters, and the remainder was purchased by her with moneys derived from the sale of real estate, which came to her from the same source. The personal estate was also the proceeds of real estate, which she took by descent and devise from her father and sisters.

Some of the defendants appeared and put in their answers admitting the facts stated in the bill; but many did not appear, and, as to them, the bill was taken *pro confesso.* Among the defendants who did not appear, many resided out of the jurisdiction of this court, and the only notice of the pendency of this suit, to the absent defendants, was by publication and postage.

The cause was tried before a single judge, Mr. Justice Potter, on the bill and the answers of those defendants who appeared,

and two decrees were made by him, from which the complainants appealed; one of which fixed the amounts to be allowed to the complainants as administrators, and to the respective counsel in said cause for expenses of administration and as compensation for services, and the other of which was, in its essential parts. as follows :—

"This cause came on to be heard before me,  *   *   *   and was argued by counsel, and thereupon, upon consideration thereof, it is now   *   *   *   ascertained and declared by me that, under the circumstances of this case, as disclosed by the pleadings, Eleanor Field, the testatrix named in the bill of complaint of the above-named complainants, is to be deemed and taken to have departed this life intestate, as to and concerning the residue of her estate, which, in and by the sixth clause of her last will and testament, in the said bill of complaint mentioned, she gave, devised, and bequeathed to her nephews, Robert Field, Aaron Field, William F. Waterman, and Nathan Waterman, and her niece, Mary Field, and that the balance of the moneys which shall be distributable by said complainants ought to be paid and distributed to and among such of the descendants of the deceased brothers and sisters of the said testatrix, namely, Nehemiah Field, Abner Field, David Field, and Esther Waterman, as were living at the time of the said testatrix's decease, that is to say, one fourth part to and among the descendants of the said Nehemiah Field, one other fourth part to and among the descendants of the said Abner Field, one other fourth part to and among the descendants of the said David Field, and one other fourth part to and among the descendants of the said Esther Waterman, to the remotest degree, their respective executors, administrators, or assigns, and the issue then living of any descendants of said brothers and sister who died in the lifetime of the said testatrix, their respective executors, administrators, or assigns, in equal shares as between or among brothers and sisters; and that the child or the children, collectively, throughout all the degrees of any of the said descendants who died in the lifetime of the said tes-

tatrix, shall represent such descendant or descendants, and take the share or respective shares of the said distributable estate which his, her, or their parent, or respective parents, would have taken, if living. And it is now ordered, adjudged, and decreed, that from the funds now in the hands of said complainants, the sum of twenty-four thousand dollars be forthwith paid out and distributed in manner as aforesaid. And that the balance of said fund be held by said complainants, subject to the further order of this court."

A motion having been filed by some of the defendants to dismiss the appeal from the last named decree, on the ground that the complainants were not aggrieved thereby, this motion, as well as the questions raised by the appeal of the complainants, were argued together before the court.

*Bradley and Markland, for the complainants :—*

The questions arising upon the facts here given are, whether the distributable funds in the hands of the complainants, as administrators, should go to the lineal descendants of the four residuary legatees, who died leaving issue, or their devisees, or grantees, if any, or some and which of said descendants, devisees, or grantees; or, whether said funds, or some part thereof, should go to Stephen Field, the sole nephew of the testatrix, as ancestral property ; or, whether said funds should go to the heirs of the testatrix as intestate personal estate ; and, if to the heirs as intestate personal estate, whether to all or some only, and what classes of objects constitute the heirs of the testatrix, within the meaning of our canons of descent. All these questions depend upon the construction of the will in reference to the conversion of the property thereby directed, and the devise in favor of the five residuary devisees. The other questions in the case are, whether this suit has drawn the entire administration of this estate from the court of probate into this court, and whether the complainants are persons entitled to appeal ; the former arising from the decrees, and the latter from the motion to dismiss.

I. The first question is upon the motion to dismiss. Sub-

stantially there is only one decree and appeal here, and in the nature of the case the complainants are parties aggrieved within the meaning of chapter 692 of the statutes, sections 3 and 5. The purpose of the appeal plainly is to obtain the opinion of the full court, as well upon the very grave questions raised by the bill and answers, as to which the complainants have sought the advice of this court, as upon the equally grave question raised by both of these decrees, whether this suit has drawn the entire administration of this estate from the court of probate into this court. These questions, it is obvious, directly affect the complainants, both officially and personally; and therefore it is their right and their duty to procure a full and complete adjudication of all the questions in authoritative and accessible form. And especially must this be so, as many of the defendants named in the bill have not appeared or answered, and it is entirely uncertain whether all the persons, who may be interested in these funds, are, in any sense, before the court, or can be in any way bound by a decree which does more than *advise* the complainants as to their duty in making distribution. *Forgay* v. *Conrad*, 6 How. (U. S.) 203; 2 Dan. Ch. Prac., 3d Am. ed. 1010 note; Rev. Stat. 1857, ch. 153 §§ 1, 6; *Smith* v. *Sherman*, 4 Cush. 411; *Wiggin* v. *Swett*, 6 Met 196; *The Mayor, &c., of Gloucester*, v. *Wood*, 3 Hare, 131, 139; *Bradford* v. *Boudinot*, 3 Wash. C. C. Rep. 122; *Ammon's Appeal*, 31 Penn. St. Rep. 311.

II. The next question is as to the questions raised by the bill and answers, and respecting which the complainants have sought the advice of the court. 1. The money should not go to the lineal descendants of the four residuary legatees who died leaving issue. Here the gift is to the legatees named, provided they all survived the testatrix, and if they should not all survive her, then to such of them as should survive her. But none survived. It must, therefore, be held that the gift failed, and that the heirs are entitled to the money. 2 Story's Eq. Juris. §§ 1165–6. 2. The only ground upon which the descendants of the legatees can take the money is, that the proviso as to the survivorship created a condition which became

impossible in the lifetime of the testatrix, and therefore the gift became absolute, and the descendants of the legatees are entitled to be substituted under the provisions of the Revised Statutes, ch. 154, sec. 12. It is obvious, however, that such cannot be the case. The gift is, in effect and substance, simply a gift to such of the legatees as should survive the testatrix, and falls within the principle of the authority above referred to. Here the failure, which constitutes the impossibility, is not of something annexed to the gift, but of the gift itself. If this can, with any propriety, be called a condition, it is manifestly such a condition as forms the very essence and substance of the gift itself, and is inseparable from it; so that when the terms of the proviso cannot be satisfied, there is no gift at all. The statute referred to does not apply in a case like this. It was intended by that provision simply to modify the common law rule as to lapsed devises, in favor of the lineal descendants of a devisee or legatee, to whom there was a devise or bequest out and out, and which must have taken effect, at all events, *pro forma doni*, in case the devisee or legatee had been in being and ready to catch the gift. But that is a very different thing from a gift which is only intended to vest in a possible class as in the case at bar. In this case there never was any devise or bequest upon which the statute could operate, by reason that the bequest is in terms dependent upon the existence of the objects named at the time when the will took effect. *Moore* v. *Dimond*, 5 R. I., 121, 128. 3. The money ought not to go to the sole nephew as ancestral estate. As to this, the well-known doctrine of equitable conversion, and the adjudications upon the ancestral clause of our statute of descents, must be conclusive. *Fletcher* v. *Ashburner*, 1 Bro. C. C. 497 ; 1 White & Tud. Lead. Cas. (3d Am. ed.) 775, and English and American notes; *Cole* v. *Battey*, 2 Curtis, 562 ; *Smith* v. *Smith*, 4 R. I. 1 ; 2 Redfield on Wills, 125, 126 ; *Green* v. *Jackson*, 2 Russ. & Myl. 238. 4. The case of *Cole* v. *Battey*, and *Smith* v. *Smith*, also disprove the statement contained in 4 Kent's Com. 402, that in Rhode Island " there is no representation among collaterals after brothers' and sisters' children." This statement was evidently predicated

upon the provision contained in Dig. 1798, page 287, but which is not contained in any of the subsequent digests.    5.  The result is, therefore, that the nephew can only take *per stirpes* with the other heirs, and as if this property was personal estate purely at the death of the testatrix.    6.  The only other point is, whether any of the defendants are to be excluded from the distribution under the provisions of the Revised Statutes, ch. 159, sec. 3.    Thus far there does not appear to have been any judicial interpretation of this provision.  If it means anything, it excludes from the line of representation the descendants of such of the nephews of the testatrix as died in her lifetime.  For example, Aaron Field, a nephew, died before the testatrix, leaving six children, namely Henry Field, George Field, Albert Field, Eliza Field, Arthur Field, and Amy Field.  Amy intermarried with one Yeomans, and died before the testatrix, leaving four children, namely, Ann Yeomans, Andrew Yeomans, Sarah Yeomans, and Henry Yeomans.  It should seem that, under the section referred to, the children and grandchildren of this nephew, Aaron Field, are not entitled to represent the nephew in the distribution.  The same rule should be applied in case the court should be of opinion that the lineal descendants of the four residuary legatees are entitled to this money.

III.  The next question is, whether this suit has drawn the entire administration of this estate from the court of probate into this court.  This is a very grave question, and one which deserves much attention.  It relates to the boundary line between this court as a court of equity and the courts of probate throughout this state.  And we submit that the right of this court to take upon itself the administration cannot be rested upon the abstract proposition, that where equity obtains jurisdiction of a cause, for any purpose, it will retain it, generally, until complete justice is effected ; or, upon the practice of the English court of chancery in cases of suits in which executors or administrators are concerned.  The application of the general proposition referred to is excluded by the nature and object of the suit; and the practice of the English chancery is inapplicable to and totally incompatible with the probate system of

this state. 1 Story's Eq. Juris. (Redfield's Ed.) p. 61–76, 519, 543, *a; Heirs of Adams v. Adams,* 22 Verm. 50; *Stewart* v. *Stewart,* 31 Ala. 207; *Greenwood* v. *Wakeford,* 1 Beav. 676; *Jennison* v. *Hapgood,* 7 Pick. 7; *Pratt* v. *Northam,* 5 Mason, 95; *Mallett* v. *Dexter,* 1 Curtis, 178. The case of *Stewart* v. *Stewart* supports the views of Redfield J. in *Heirs of Adams* v. *Adams,* and in 1 Story's Eq. § 543, *a.* And we believe that the only instances, to be found in the reported cases, of the courts of chancery assuming the entire administration, have been where the administrators have been guilty of fraud or refused to account, as in *Pratt* v. *Northam,* and *Mallett* v. *Dexter,* or the like; or, where, as in *Stewart* v. *Stewart,* the administrator himself has come into chancery upon some ground peculiar to courts of equity, and as to which no relief could be had in the court of probate, and at the same time has prayed that the administration might be completed in connection with the other relief sought. A fair illustration of this view is to be found in *Greenwood* v. *Wakeford;* and the cases of *Jennison* v. *Hapgood* and *Mallett* v. *Dexter,* in their general reasoning, support the same view.

*Eames and James Tillinghast, for the descendants of William F. Waterman and Robert W. Field and Stephen Field:—*

I. As to the motion of these defendants to dismiss plaintiffs' appeal from interlocutory decree of December 22d, 1869, ascertaining the parties entitled in distribution, and ordering the plaintiffs forthwith to distribute accordingly $24,000 of the funds in their hands. This appeal should be dismissed. The amount left in the plaintiffs' hands undistributed by this decree being several thousand dollars more than sufficient to meet all possible claims the plaintiffs make or can now have upon the estate for compensation or costs and expenses, they have no possible interest in this decree, nor are in any possible sense "*parties aggrieved*" by it, and consequently have no right of appeal from it. *Smith* v. *Broadstreet,* 16 Pick. 264; *Lewis* v. *Bolitho,* 6 Gray, 137; *Henry* v. *Esty,* 13 Gray, 336; *Stevens* v. *Palmer's administrators,* 15 Gray, 506. For in the question as to who are entitled to this fund, the plaintiffs have no possible

interest, in fact are not even entitled to be heard upon it. Their bill in this regard is strictly in the nature of a bill of inter-pleader.

II. If the appeal from this interlocutory decree is sustained, then, as to its general merits, and also as to the appeal from the final decree of December 24, 1869 : In so far as these decrees assume jurisdiction to provide for and direct the final distribu-tion of the estate, they are unimpeachable. 1. Where a court of chancery has full equity powers as our own, it is well settled it has concurrent jurisdiction with the courts of law in the ad-ministration of the assets of deceased persons, and this jurisdic-tion is not ousted by the statutory jurisdiction conferred upon the probate courts. 1 Story Eq. Jur. §§ 531 to 543, &c. ; 2 Williams on Executors, 1717–1718, notes and cases ; 1 Redfield on Wills, 492–3 ; 2 Ib. 188 ; *Harvey* v. *Richards*, 2 Gall. 216 ; same case, 1 Mason, 381 ; *Pratt* v. *Northam*, 5 Mason 95 (101, 103, 105); *Gould* v. *Hayes*, 19 Ala. 438 ; *Pharis* v. *Leachman*, 20 Ala. 662 ; *Cram* v. *Green*, 6 Hammond, (Ohio,) 429 ; *Parsons* v. *Parsons*, 9 N. H. 309, (see 322–336); *Walker* v. *Cheever*, 35 N. H. 339 ; *Waldron, Isley & Co.* v. *Simmons*, 28 Ala. 629 ; *Freeland, Ex'r.* v. *Daves*, 25 Ill. 294 ; *Clarke* v. *Clarke*, 17 Ga. 485 ; *Sanford, Adm'r*, v. *Thompson*, 18 Ga. 454 ; *Dorsey* v. *Reese*, 14 B. Mon. 157 ; *Wood* v. *Ford*, 29 Miss. 57 ; *Salter* v. *Williamson*, 1 Green, Chan. 480 ; *King* v. *Berry*, 2 Green, Chan. 44 ; *Crain* v. *Fergu-son*, 1 Md. Chan. Decisions, (1 Johns.) 151. 2. And the ad-ministrators having brought the whole fund into court to obtain a construction of the will, and the court having thus acquired jurisdiction over it, it will not stop with simply declaring the rights of the parties, but will now go on and complete the ad-ministration of the estate, particularly as nothing remains to be done but to execute its own decree. Cases *supra* ; also *Stewart, Adm'r*, v. *Stewart*, 31 Ala. 207 ; *Keeton* v. *Spradling*, 13 Missouri, 321 ; *Walker* v. *Morris*, 14 Ga. 323 ; *Morrill* v. *Dickey*, I John. Chan. 153, (see 157); *Rogers* v. *Ross*, 4 John. Chan. 404 ; and see, also, *Franklin Ins. Co.* v. *McCrea*, 4 Green, (Iowa,) 229 ; *Brooks* v. *Stolley*, 3 McLean, 523, and analagous cases, that where a court of equity has obtained jurisdiction for one purpose, it will go on and administer full relief.

*James Tillinghast, for the family of William F. Waterman:*—
I. The estate is to be distributed as testate estate, and its distribution is governed by the sixth clause of the will; the legacies (except that to Nathan Waterman,) being saved from lapsing by section 12, of chapter 154 of the Revised Statutes, page 358. For, 1. It is very plain, that the testatrix did not intend to die intestate as to any portion of her estate. This is evident, from the entire residue being disposed of by the sixth clause. 2. It is also evident, that her *general* intent was that that her five nephews and nieces there named should take this entire residue equally. With a *special* intent, however,. that if one or more of them died in her lifetime and others survived her, the survivors should take the whole. And this is the whole scope of the proviso, for there is no bequest over in case of the decease of all. For the words, " heirs, executors, administrators and assigns " must be used here as words of limitation ; that is, as showing the intent to pass the absolute property, and not as substituted legatees ; for, besides there being nothing to show any such intent of substitution (directly the contrary by the gift to the survivors) as substituted legacies, they would be void for uncertainty. *Holloway* v. *Holloway*, 5 Vesey, 399 ; *Waite* v. *Templer*, 2 Simmons, 524 ; *Palin* v. *Hills*, 1 M' C. & Keen, 470. The proviso is to be read as thus : "In equal shares, provided they all survive me, but if either should die in my lifetime and others should survive me, such survivors shall take the whole." There would then be no gift over in the contingency that has happened. For " the general rule of law is, that an absolute interest is not to be taken away by a gift over, unless that gift over may itself take effect." Per Wigram, V. Chan., in *Green* v. *Hawes*, 1 Hare, 431. The only other possible construction of the proviso would be the strict one requiring that all of the legatees should survive the testatrix ; but this would not only entirely defeat the rest of the clause preferring those who might survive, but upon the decease of *either one* in the lifetime of the testatrix would render this whole residue intestate, a consequence that could not have been intended, and one the court never adopts but from imperative necessity. 2 Redfield on Wills, p. 442, § 445, p. 615, § 34, cases cited.

II. It follows, therefore, that the descendants of each of these four residuary legatees, who left descendants, are entitled, at all events, to one-fifth of this fund now remaining in the hands of these administrators, to the exclusion of the general heirs.

III. The only remaining question is as to the one-fifth given to Nathan Waterman, which lapsed by his decease without issue before the testatrix. Does this also go to the descendants of the other four legatees, or as intestate estate to the heirs general of the testatrix ? To the descendants of William F. Waterman it makes no difference which it is. For there being but four brothers and sisters of the testatrix who left descendants, and these descendants of William F. Waterman being the sole representatives of one of them, viz., of her sister Esther, as they are also of one of the four residuary legatees, viz., said William F. Waterman himself, under either construction, they take one-fourth of this one-fifth, thus entitling them in the whole to one quarter of the whole fund. And it is submitted that they take in the following proportions, viz. : Mrs. Aborn, Mrs. Staddon, Mrs. Burgess, Mrs. Grinnell, Nathan Williams, and James Waterman; being grand nephews and nieces of the testatrix, one-eighth of this one-quarter,—one-thirty second each ; and Sophia and Henry Waterman, being great grand nephew and niece, one sixteenth of this one-quarter,—one-sixty-fourth each, of the entire fund. First, because it is submitted that this section 12, page 358 of the Revised Statutes is to be construed in connection with the statute of descents, chapter 159 particularly, section 5, page 378, as in *pari materia*, and, therefore, that the descendants of the deceased legatee are to take *per stirpes* under this latter section, and not *per capita*. See per Lord Hardwicke in *Stanley* v. *Stanley*, 1 Atkins, 457–8. And that this section 12 is to receive a liberal construction. *Paine* v. *Prentiss,* 5 Met. 396, (399.) It is to be construed, in fact, as though it read like the Alabama statute, which is more carefully worded, providing that the descendants shall take in the same manner as though the legatee " had survived the testator and died intestate." See *Jones* v. *Jones, Executor,* 37 Ala. 646,

same case; 1 Ala. Sel. cases, 574; and compare *Yeates* v. *Gill*, 5 B.
Mon. 203. And, secondly, because it is further submitted that
whether the conversion of the estate by the fifth clause of the
will be " *out and out*," or only for the purposes of the will, and
whether it be the fact or not, (not averred in the bill, and there-
fore not admitted by these respondents, but asserted in the an-
swer of Stephen Field,) that a portion or all of the funds now in
the hands of the administrators is the proceeds of ancestral real
estate sold by them, is entirely immaterial, since it is well set-
tled that descendants under the ancestral clause (section 6, page
373,) of the Statutes are to be ascertained by tracing from the
immediate ancestor, and, with the difference only of following
the blood, by the canons contained in other sections. *Dexter* v.
*Dexter*, 4 Mason, 302 ; *Gardner* v. *Collins*, 2 Peters, 58 ; *Cole* v.
*Battey*, 2 Curtis, 562 ; *Smith* v. *Smith*, 4 R. I. 1. And that
descendants to the remotest degree take their parents' share,
that is, are, under these canons, of the same kin as their parents.
*Dexter* v. *Dexter*, 4 Mason, 302 ; *Cozzens* v. *Joslin, Executor*, 1
R. I. 122.

IV. To the descendants of the other residuary legatees, how-
ever, it does become a material question, whether this lapsed one-
fifth given to Nathan Waterman, is to be distributed as testate
or intestate estate. And in their behalf it is submitted that it
is testate estate, and goes exclusively to the descendants of the
other four legatees, one fourth each *per stirpes*, and this by force
of the will and statute (section 12, page 358,) combined. It is not
necessary to consider what might have been the construction, if
one or some of these residuary legatees had survived the testa-
trix, while others had died in her lifetime, leaving descendants,
whether the survivors would then have taken the whole to the
exclusion of the descendants of those deceased ; that is, whether
that being the precise event provided for by the proviso in the
will, it would over ride the statute, or not. That event has not
occurred. The event that has occurred is not in precise terms
provided for in the will. But the general intent is apparent,
that these five nephews and nieces, and their *representatives*,
should have the entire residue. At common law, this intent must

have failed by the lapse, but the statute preserves and effectu·
ates it in favor of the descendants—that is, the "*heirs.*" Had
the four legatees, themselves, survived, they would, by the very
terms of the will have taken the whole ; and the statute in ex-
press terms, and without qualification, declares, that the de-
scendants shall take "the same way and manner as such de-
visee" (legatee) "would have done in case he had survived the
testator," and there is nothing in the will to conflict with or
control this, for there is no gift over.   Compare cases *supra*, ·5
Met. 396 ; 37 Ala. 646 ; 5 B. Mon. 203.  Also, *Johnson* v. *John-
son*, 3 Hare 156, (25 Eng. Chan.)

*Rogers for Arthur F. Field, an heir at law of Eleanor Field,
deceased :—*

If the ordinary use of language is to be regarded in judging
of the intent of a testatrix, and it is all important, the intent of
the sixth clause of Eleanor Field's will is as if it had read—
And the residue I give equally to such of my nieces and
nephews (naming them) as shall survive me, their respective
heirs, executors, administrators and assigns.  If none survived
her, there was no devise. The words heirs, executors, administra-
tors and assigns are merely words of limitation to indicate that
the gift to such survivors of her nieces and nephews, was in
fee simple.   Suppose *one* of the persons named in the sixth
clause as a devisee in case of survivorship, had died in the life-
time of Eleanor Field, leaving the other four surviving the said
Eleanor, could there be any pretence but that the children of
such deceased person would have been excluded from coming
in to take the one-fifth their parent would have taken had he
or she survived the said Eleanor.  We think not ;—and if his
or her children were excluded, we do not see why, the whole
five named in the sixth clause dying in Eleanor Field's lifetime.
the children of all of them are not excluded, making the said
Eleanor intestate as to the residuum.  Sec. 12, Chap. 154 of the
Revised Statutes was intended to provide against lapses, and
says, in spirit, that the blood of the devisee, viz., the descend·
ants, shall stand in the place of the deceased devisee.  It does
not intend to over-ride the express wish and intent of a testator,

and to say that a testator may not, by apt words make a devise conditioned on a person's being alive at a certain time. If such an intent is clear, the law will respect it. The statute only says, that it will substitute those for a deceased devisee, that, by an unrebutted presumption of law, are dearest to the devisor after the death of the devisee, viz., the children or descendants of such deceased devisee. In the case at bar, the presumption, for which the statute provided, is rebutted in the language of the will, and hence the statute does not apply. *Moore* v. *Dimond,* 4 R. I. 121. Although the law will always strive after a construction that will not make a testator intestate as to any part of his estate, yet it will not make a new will for that purpose. It is clear that Eleanor Field, by singling out certain of her nieces and nephews for her bounty, had a special regard for such favored ones; that such regard was personal to them individually, and that if any of them did not survive her, such deceased one's children and descendants were to be excluded from her bounty, if any of the favored ones should survive her. If all such special objects of her bounty died in her lifetime, then the law would come in and distribute her property just as if she had said,—and if none of them survive me then to my heirs at law forever,—and the descendants of the five favored nieces and nephews would come in with her other heirs at law.

*W. A. Field, of Massachusetts, for the children of Robert W. Field:—*

Is section 12, chapter 154 of the Revised Statutes applicable to the residuary bequests? The only ground on which it can be contended that it is not, must be that the bequests are upon a condition precedent which has not been performed, and therefore they never had an inchoate existence as bequests, and so the persons named never had any devise or bequest, and therefore their descendants can take nothing under this section. The section, in terms, makes no distinctions between contingent and absolute legacies. It applies to all cases of lapse at common law by death of the legatee. The descendants are to take "in the same way or manner as such devisee would have done in case he had survived." The persons named would have taken

if they had survived; not surviving, therefore, their descendants take in a case not within the proviso of the bequest, which provides for the case of all or some one or more surviving, but has no application to the case of none surviving, which is this case.

The bequests, according to the natural, obvious, and strictly grammatical import of the terms, are not upon any condition either precedent or subsequent, but are direct, immediate, and absolute; the proviso does not directly attach to the gift, but to the mode of distribution in the cases it covers. The language is not, " I give and bequeath to the legatees, provided they all survive me," but, " I give and bequeath to the legatees, equally between them, share and share alike, provided they all survive me "; and this proviso makes no provision for the case which actually happened. This was not necessary, for the statute made the disposition which the testatrix probably desired. If this proviso does apparently constitute a condition precedent, courts may, to prevent intestacy, and to carry out the will of the testatrix, construe it merely as a conditional limitation. The intention of the testatrix, as shown by the will, is to govern, and the making of the will with the residuary clause, is proof that the testatrix did not mean to die intestate as to any portion of her estate. The construction contended for gives effect to that intention, does no violence to the language, is inconsistent with no rule of law, and gives a meaning to every word of the bequest. Courts incline decidedly against any construction of a will which results in partial intestacy. 2 Redfield on Wills, 442, §§ 4 and 5; Ib. 615, § 34; *Phillips* v. *Chamberlain,* 4 Ves. 51, 59; *Booth* v. *Booth,* 4 Ves. 399; *Lett* v. *Randall,* 10 Sim. 112, 115; *Eldridge, Admr.,* v. *Eldridge, Ex'r.,* 9 Cush. 516, 519; *Furness* v. *Fox,* 1 Cush. 134; 2 Rop. on Leg. 1462, 13th rule of construction; 2 Jarman on Wills, 743, 16th rule of construction; 2 Williams on Executors, 1056. Upon this construction, as Nathan Waterman left no lineal descendants, the entire residue is distributable equally *per stirpes* among the descendants named in the bill of Robert W., Aaron and Mary Field, and William F. Waterman. The two descendants of Robert W. being his nine children and one great grand-child, are each

entitled to one fortieth of this residue. If the court hold that the devise and bequest are upon the condition precedent, that all or one or more of the five persons named should survive the testatrix, and none having survived her, that the devise and bequest never took effect even inchoately, and that this residue must be administered upon as intestate property, it seems that the children of Robert W. Field will take in equal parts the share of this residue which Robert W. Field would have taken had he survived the testatrix, and she died intestate. It would seem that there is no difference, in this case, in the descent of the real and of the personal estate. Revised Statutes, section 1, par. 3, chapter 159; section 5, chapter 159; section 9, par. 3, chapter 159.

The direction in the fifth article of the will to her executors to sell all the real estate, and convert it into cash; and the language of the sixth article of the will may, perhaps, be held to indicate that this residue is, so far as the will is concerned, to be treated as personal property; and it may be that this residue, if regarded as intestate property, the powers granted in the fifth article, being valid, although the legacies of the residue in the sixth clause fail, would be distributable as personal property. Redfield on Legacies and Executors, vol. 2, sec. 18, pp. 125, 126, and cases cited; 1 Williams on Executors, 554, 555; *Green* v. *Jackson*, 2 Russ. and M. 238. But if the legacies fail, and the portion of the residue undisposed of is held to descend as real or personal estate proportionately to the respective amounts of the constituent elements, this seems to make no difference in the persons who will take, or the amount each will take. Even in case of ancestral real estate, the degrees of kindred are to be reckoned by the canons directing the course of descent as a positive rule of law, and the only difference between the descent of such an estate and an estate acquired by purchase, is, that the heirs must be of the blood of the person from whom such estate came or descended. In the case at bar, the property is not alleged to be ancestral in the bill. Rev. Stat. ch. 159, § 6; *Smith* v. *Smith et al.* 4 R. I. 1. The descendants of Robert W. Field are of the blood of the testatrix's father. The word " descendants,"

in the 3d par. section 1, chapter 159, and section 5, same chapter, means all descendants, and is not to be limited to children. Such is its meaning in a will. 2 Jarman on Wills, Perkins' ed. p. 32 ; 2 Redfield on Wills, pp. 1–14, and cases cited ; 2 Williams on Executors, p. 954, § 3. This word "descendants" seems to have been industriously used to prevent limiting representation among collaterals to brothers' and sisters' children.

In *Quimby* v. *Higgins,* 14 Maine, 309, the decision is upon the meaning of the Maine statute, which is only partially stated in the opinion. This statute is section 17, chapter 38, 1st vol. Smith's Laws of Maine, page 157. The important words are, "when there shall be no issue nor father, the same shall descend in equal shares to the intestate's mother, if any, and to his brothers and sisters, and the children of any deceased brother or sister, by right of representation, and if the intestate have no issue, father, brother or sister, then the same shall descend to his mother, if any, but if there be no mother, then to his next of kin in equal degree." This statute authorizes distribution to the children of any deceased brother or sister by right of representation, and in case the intestate leave no father, mother, brother or sister, the estate descends to the next of kin in equal degree. The grand child of a deceased brother, there being no special statutory provision making him so, is not *next of kin in equal degree* with the children of such deceased brother. In 1852, Maine changed her statutes in this respect in consequence of this decision—par. 3, section 1, chapter 75, Revised Statutes of Maine, 1857,—so that grand children of a deceased brother in the case stated now take by right of representation. In all cases deciding that representation among collaterals is to be limited to the children of brothers and sisters, the decision rests upon the language of statutes essentially different from the statutes of Rhode Island. In England, it rests on the express language of the 6th and 7th sections of the Statutes of Distribution. See 2 Williams on Executors, § 4, p. 1291 ; §§ 6 and 7, cap. 10, 22d and 23d, Car. II. In Rhode Island, the English law was changed by Sec. 1, Digest of 1798, pages 287, 288 ; Sec. 1, Digest of 1822, page 222. See *Coggins* v. *Joslin,* 1 R. I. 122.

Four brothers and sisters of the testatrix left descendants, and the descendants of the testatrix's brother, Abner, are entitled to one-fourth of the estate undisposed of by the will, one-half of this one-fourth, that is, one-eighth, descends to Stephen Field, and one eighth descends to the descendants of Robert W. Field, and one-tenth of this one-eighth, that is, one-eightieth, descends to Lilia M. Davis, great grand-daughter of said Robert W. Field, and one-eightieth descends to each of the children of Robert W. Field still living.

POTTER, J. This case was heard before a single justice, and now comes before the full court on appeal by the administrators. The case was heard and decided, and there being some delay in drawing the decree, on motion of parties two decrees were entered *nunc pro tunc* by the judge, as of dates near the time when the decision was actually made.

We see no objection to this, as it does not take away the right of appeal, which runs from the date when the decree is actually entered.

The judge rendered two decrees, one settling the rights of the parties and distributing the sum of $24,000 forthwith among the persons entitled to distribution, and the other, and of later date, distributing the remainder after the allowance of sundry accounts. The reason given for this was, that it was thought the former decree would not be appealed from, and would lead to an early distribution of the greater part of the funds; leaving the disputable matters to be settled on appeal from the last decree.

A motion is now made to dismiss the appeal from the first decree, (which only directed a distribution,) on the ground that the administrators are not *aggrieved* parties, and therefore have no right to appeal under the provisions of the Revised Statutes, chapter 692, section 3.

The administrators are not interested in the distribution, but they are interested in the allowance of their compensation; and represent the estate so far as regards the allowance of any accounts or claims against the estate.

And there being an appeal from the second decree, and that

bringing up before the court all the matters involved in it, (one of which is the distribution.) and the parties having a right to be heard thereon, as well as on the particular ground, if any, on which the appeal was made, it seems to us that it necessarily draws after it the reconsideration of the first decree so far as it directed a distribution. If the distribution ordered by the second decree is wrong, it follows, of course, that the first decree must be erroneous. And although the first of these decrees was in a sense interlocutory, yet, inasmuch as it settled the right of the parties to a part of the fund, it is, so far, a final decree. *Forgay* v. *Conrad,* 6 Howard, 203.

But it is contended by the administrators, that this court has no power except to advise the administrators in the execution of the trust, and that it has no jurisdiction to settle accounts and decree distribution, because that is in the exclusive jurisdiction of the Court of Probate ; and that all they asked of the court was advice.

The bill states that the administrators have settled their final account with the Court of Probate, and that there is a certain sum remaining in their hands for distribution ; that they are advised it is doubtful to whom they ought to distribute, and that they cannot safely do it without the direction and indemnity of this court ; and the prayer is, that the rights of the defendants in said money may be ascertained and declared by this court ; that all proper directions may be given to them as to the payment and distribution, and the persons to and among whom, &c., &c. ; and that they may be protected and indemnified in paying a due observance to the decrees and directions of this court, and for further and other relief, &c. Now, if the administrators wish for advice only,then they are not properly before the court for that purpose. On the contrary, they have asked for the direction of the court, and to be indemnified for following its directions. Before the Supreme Court had equity powers, the jurisdiction of the Court of Probate was indeed exclusive, because there was no other court which had any power over matters of this kind. But since full equity jurisdiction was conferred upon this court, it has power, when a proper bill is

filed, and it has the fund or the parties before it, to proceed to a final settlement and distribution, if the nature of the case renders it proper.

It is made a further objection to a decree by this court, that all the parties interested may not have been discovered, and may not have been served with process, and that so the decree rendered may not bind all parties. As the fund is within our jurisdiction, we have no doubt that the decree will bind all parties properly notified either by personal or substituted service ; and that the court has the power and will exonerate the administrators for payment according to its decree, and will protect them therefor. But it has been held in other courts, that in such case, parties who have not had actual notice, (as may happen in case of advertisements,) and who use reasonable diligence, will be allowed to file a bill for relief against the parties who have received the money, (if they have received more than they are justly entitled to,) and they will be decreed to refund their proper proportions. Story's Equity Pleadings, § 106, and cases cited ; 2 Williams on Executors, 1722. And it is stated by the administrators, that in the present case all the different degrees of kindred are represented before the court.

The cause being thus properly before the court, upon the appeal of the administrators, the administrators, by their counsel and several of the respondents, have presented and argued questions as to the rights of the parties in the fund and the shares in which it is to be distributed ; one of the respondents claiming the whole as next of kin.

Eliza Field died March 6, 1864, and her will was duly proved in April, 1864. The material parts are these : "I hereby authorize, empower and direct my executors herein named, as soon as conveniently may be after my decease, to sell at public auction and convert into cash, all my real estate of which I may die seized and possessed," &c., with power to execute deeds. She then gives the residue to five nephews and nieces, Robert Field, Aaron Field, Mary Field, William F. Waterman, and Nathan Waterman, "equally between them, share and share alike, and to their respective heirs, executors, administrators

and assigns, *provided they all survive me*; if not, to such of them, the said Robert, Aaron, Mary, William F. and Nathan, *as shall survive* me, equally between them, share and share alike, and to their respective heirs, executors, administrators and assigns." None of these nephews or nieces survived her, but all of them, except Nathan Waterman, left lineal descendants, as did also several of her brothers and sisters. Stephen Field was the only child of a brother or sister living at her decease, thus being the nearest of kin.

It is contended on behalf of the representatives of the four devisees who left children, that they are entitled to take the property (or at least four-fifths of it) by virtue of chapter 154, section 12 of the Revised Statutes; "when any child, grandchild, or other person, having a devise or bequest of real or personal estate, shall die before the testator, leaving a lineal descendant, such descendant shall take the estate, real or personal, as devisee or legatee, in the same way and manner as such devisee would have done in case he had survived the testator." And it is contended, that the will must be supposed to be made in view of the law, and that the testatrix knew that the law had provided for the case of their not surviving her, and that the law made the very provision she desired.

If she had made an unconditional devise, this section would have provided for the case. But her intention here seems very evident, that not all of the five, but only such of them as outlive her, shall take; and that is made a condition; nothing is given to any one who does not survive her; beyond those five she does not seem to have entertained any preferences among her numerous relatives; and seems to have been willing to let the law take its course as to the rest. If she had intended to provide that their families should take it, the most common scrivener could have used language that would have carried out her intention. And the conclusion seems unavoidable, that she must be considered as dying intestate so far as this residuary estate is concerned.

On behalf of Stephen Field, as the nearest living relative, a claim is set up to the whole of the property. His counsel con-

tend that the property is all ancestral, and that, as next of kin, he is entitled to it by virtue of chapter 159, section 6 of the Revised Statutes of 1857. " Where the title to any real estate of inheritance, as to which the person having such title shall die intestate, came by descent, gift or devise, from the parent or other kindred of the intestate; and such intestate die without children, such estate shall go to the kin next to the in-testate, of the blood of the person from whom such estate came or descended, if any there be." A portion of this property had been derived by the intestate from sales of ancestral estate made by herself before her decease, and another portion of it had been derived by her from the rents and accumulations of profits of said estate. This is not stated in the bill, but was stated in argument and not denied. So far as this personal estate is con-cerned, chapter 159, section 9, p. 3, leaves no doubt that it is to be distributed without any regard to the blood. The statute has regulated it so since 1844, and the same had been settled by the courts as the construction of the statute of 1822.

But the sum of $3,700 of the personal estate is derived from sales of ancestral real estate made by the executors after her decease, by virtue of the power and direction given in the portion of the will we have quoted. Her will seems to make an absolute conversion of the real into personal estate necessary. The sale is not authorized, but positively directed, and the executors have no discretion as to the sale, (except as to convenient time,) or as to the disposition of the proceeds.

But it is not necessary to decide this claim upon the doctrine of conversion. All the claimants are descendants of the brothers and sisters of the testatrix, and all of course are of the blood of the persons from whom the estate came, and all entitled to shares thereof, unless Stephen would be entitled to the whole, (if considered as real,) on the ground of his being next of kin. His counsel contend that section 6 of chapter 159, before recited, was intended to provide for ancestral estates as an entirely distinct class, and without any reference to the classification of heirs in the previous sections. Whatever doubts may formerly have been entertained on this point have been put at rest by the

decision in *Smith v. Smith*, 4 R. I. Rep. 1. All parts of the statute are to be construed together. In ascertaining the next of kin under section 6, we are to be guided by the previous classification in section 1; and of course the right of representation applies *ad infinitum* according to section 5.

It is claimed in behalf of Stephen Field, that the word "descendants," in the last clause of section 1 of the act of 1857, means descendants *nearest in degree*. But this must be construed in connection with section 5, which gives the right of representation.

The complainants, in their brief, put a construction upon chapter 159, section 3, which, if correct, might sustain the claim of Stephen Field. They contend that if it means anything, it excludes the descendants of all the nephews and nieces who died before the intestate; Stephen Field being the only nephew who survived her. Section 3 is, "But no right in the inheritance shall accrue to any person whatsoever, other than to the children of the intestate, unless such persons be in being and capable in law to take as heirs, at the time of the intestate's death." This is not a common provision in statutes of descent, and it may seem strange that there has been no decision on it, either in our own state or in Virginia, from whose statute ours is said to have been taken.

Our statute of 1798 was framed like many of the statutes of descents of the other states, upon the English statute of distributions, which had been the law in the colony as to personal estate for a long time previous. It provided that the estate of an intestate, if there were no children, should be divided " amongst the next of kin in equal degree, and those who shall represent them, if any of them be dead * * * no person to be considered as a legal representative of collaterals beyond the degrees of brothers' and sisters' children of the intestate." And it may have been supposed that the intention of section 3, act of 1857, (same in 1822 and 1844,) was to confine representation still more closely, and to limit it to the descending line or to children alone. But, on the contrary, on examining the statute, it seems to have been the intention of the legislature

to adopt the principle of representation in its fullest extent.

By section 1, the estate is to go to those of a particular class named and their descendants ; and if there be no descendants, then, &c. ; evidently contemplating that it shall not go to a succeeding class so long as any descendants of a previous nearer class remain. But for section 5, (which is not in the statute of Virginia,) the representation would perhaps, in some cases, be *per capita.* And this is the construction of the Virginia statute. But section 5 of our statute establishes a uniformity of representation *per stirpes* in all cases. Reeve on Descents ; 290, 292, 296 ; *Davis* v. *Rowe,* 6 Randolph, 355.

Judge Reeve is of opinion, (p. 133,) that the clause in the act of Rhode Island, 1798, " In every case where children shall inherit by representation, they shall take the same proportion of the estate as would have descended to the person whom they represent, and shall inherit the same in equal shares," was intended to abolish representation *per capita* in all cases where representation was allowed by that statute. This would go to show that the doctrine of representation *per capita* was never very congenial to the feelings of our people. From these considerations, it may therefore be inferred that the object of section 3 could not have been to limit representation to the one case of children. Reeve on Descents.

And we think we can find a different and a reasonable construction for section 3. The act of 1798 had provided that a posthumous child of the intestate should inherit as if born before the intestate's death, but had not provided for cases of posthumous children of other kindred. The act of 1822 removes all doubt growing out of conflicting decisions, and positively excludes posthumous children other than posthumous children of the intestate himself. See Chitty on Descents, 286 ; Cruise 2, 251, &c.

Judge Tucker (Bl. Com. Tucker's ed. 1803, vol. 2, appendix, p. 20,) considers that this is the object of the provision in the statute.of Virginia, and gives instances of its application. Judge Reeve, in his work on Descents, pages 290, 295, considers this section as providing for the case of posthumous children, and it is evident from page 296, that he did not consider it as in-

tended to limit representation. And in the case of *Davis* v. *Rowe*, 6 Randolph (Virginia,) Rep. 355, 397, 428, although it was not necessary to be decided in that case, this was recognized by the judges in discussion as being the purpose of the section.

By the ancient law, if a father had issue, a son and a daughter, and the son purchased land and died without issue, his sister might inherit, but might be deprived of the inheritance by the birth of a brother, no matter how long after. Co. Lit. 11, b., and Chitty on Descents, 287. The language of our statute, "such as there be," &c., evidently refers to the intestate's death, and would probably prevent the occurrence of such cases. But section 3 removes all doubt. *Davis* v. *Rowe*, 6 Randolph, 355, 397.

As the statute of Rhode Island of 1822 (same as 1844 and 1857, except that sections are substituted in the latter,) was probably copied from the Virginia statute of 1785, reënacted in 1819, (Revised code of 1819, vol. 1. p. 355,) the Virginia statute and the decisions upon it, and especially the commentaries of Judge Tucker (2 Bl. Com. Tucker's ed. 1803, appendix, p. 11,) and of Judge Reeve, (Reeve on Descents, A. D. 1825, page 285,) may always be referred to for considerations governing its construction. The Virginia act was drawn by Thomas Jefferson, and was reported by a commission consisting of Jefferson, Pendleton and Wythe. (Memoir of Jefferson, Jefferson's Writings, Tucker's ed. vol. 1.) Judge Reeve commends it as a " well penned " statute. Reeve on Descents, 313. Except in regard to the doctrine of representation, the Rhode Island act is, with the exception of a very few words, a transcript of that of Virginia.

The Virginia act provides, as we have said, for representation *per capita* in certain cases, while the Rhode Island act provides for representation *per stirpes* in all cases. It has been a very common opinion, that the act of 1822 was substantially the same with the act of 1798, except that it was drawn out in more detail. A little examination, however, would show some substantial differences. The rule of representation *per stirpes* in all cases, adopted in 1822, is neither the rule of the Roman law nor

of the English statute of Distributions, (adopted here in 1750, and practiced on before,) nor of our statute of 1798. (See Reeve, 133.)

The Roman law adopted representation *per stirpes ad infinitum* in the descending line, but limited representation as to collaterals. The English statute of Distributions, as also our statute of 1798, like the Roman, limited representation as to collaterals, but did not, like that, provide for representation *per stirpes* in all cases in the descending line. See Robertson on Personal Succession ; Reeve, 133. And under either of these statutes cases might arise which to us might appear to savor of hardship.

Our present rule of representation is an improvement upon that of the English statute of Distributions, and of our statute of 1798, and of that of Virginia. It is, in fact, the doctrine of the old common law, divested of those features derived from the feudal law, such as the preference of males, of eldest sons, the exclusion of ascendants, &c. By the spirit of that law, remote kindred never succeeded so long as any issue of nearer kindred remained. Chitty on Descents, 98, 81. So with our statute.

Distribution, even of personal property, by the strict rule of next of kin, appeared so unnatural to the English mind, that in several very important respects it had been altered by statute and by decisions of courts. Statute 1, James II. Ch. 17, § 6. Robertson on Personal Succession.

And it has been suggested, (6 Randolph, Va. Rep. 404, 417, 420, 433,) that a rule of representation was necessary to prevent trouble from too strict a construction of the paragraph, brothers and sisters " *and their descendants,*" &c., inasmuch as under those clauses, a person's descendants might claim to take with him while he was alive.

The mode of distribution directed by the decrees appealed from, will, therefore, be confirmed ; and upon the other matters, allowance of charges of counsel of the respondents out of the fund, compensation of the administrators, &c., the court will hear the parties further.

*Decree of distribution confirmed.*